## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**JOHN E. WARBURTON** and<br>**LINDA R. WARBURTON**,<br><br>                  Debtors. | Case No.  **12-60022-7** |
| **ESTATE OF EARL COURTNAGE**,<br><br>               Plaintiff.<br><br>-vs-<br><br>**JOHN E. WARBURTON** and **LINDA R. WARBURTON**,<br><br>              Defendants. | Adv No.  **12-00018** |

## MEMORANDUM OF DECISION

At Butte in said District this 21ˢᵗ day of May, 2013.

In this adversary proceeding the Plaintiff Estate of Earl Courtnage ("Plaintiff" or "Courtnage Estate") objects to the Discharge of the Defendants/Debtors John E. Warburton ("John") and Linda R. Warburton ("Linda") (together "Warburtons" or "Debtors") under 11 U.S.C. § 727(a)(1) and (a)(3), and seeks exception from Debtors' discharge under 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), and § 523(a)(6).  Warburtons, who are pro se, oppose all claims.  For the reasons set forth below, Judgment shall be entered against the Debtors excepting Plaintiff's claim from discharge, and denying Debtors' discharge.

1

This Court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b) as related to Debtors' bankruptcy case.  Plaintiff's claims seeking exception from and denial of Debtors' discharge are core proceedings under 28 U.S.C. §§ 157(b)(2)(I) and (J).  This Memorandum of Decision includes the Court's findings of fact and conclusions of law under F.R.B.P. Rule 7052 (applying Fed. R. Civ. P. 52 in adversary proceedings).

Trial of this adversary proceeding commenced at Great Falls on December 14, 2012, and was completed on January 18, 2013.  Debtors appeared pro se[1] and testified, as did their son Steve Warburton and Patricia Ann Mary Fernet.  The Plaintiff was represented by attorneys William O. Bronson ("Bronson") of Great Falls, and James A. Patten of ("Patten") of Billings.  Plaintiffs called witnesses Vicky Metzger ("Metzger"), Denise Moore ("Moore"), Randy Randolph ("Randolph"), Deitra Kraske ("Kraske"), Angela Pratt ("Pratt"), Lynn Minnick ("Minnick"), Janine Donevan ("Donevan") and Morton Goldstein ("Goldstein") to testify, and called Shirley Campbell on rebuttal.  In addition, depositions ("Dep.") of Earl Courtnage (deceased) ("Earl"), Kaycee Groven ("Groven"), and Nicole Hanson ("Hanson") were admitted by stipulation.  Debtors objected to admission of depositions of Dr. Rome Walter ("Walter") and Joyce Hickman ("Hickman")[2].

Exhibits ("Ex.") 1, 3, 4, 5, 6, 7, 8, 9, 10, 14, 15, 19, 29, 36, 37, 38, 39, 42, 48, 49, 50, 55,

---

[1]At the beginning of this bankruptcy case Debtors were represented by counsel who withdrew.  They have been represented in other litigation by attorneys who withdrew, after which they represented themselves pro se.

[2]The Court reviewed the depositions of Hickman and Dr. Walter, and overrules Debtors' objections.  Debtors had notice of those two depositions and failed to attend.  Both depositions supply background, context and a limited amount of clarification, but neither deposition includes facts which are directly material or which the Court relied on in deciding Plaintiff's claims.

56, 63, 68, 70, 72, 73, 74, 83, 84, 85, 86, 87, 88, 100, 117-124, 125, 126, and 131, were admitted

into evidence.  The Court took judicial notice of Debtors' bankruptcy schedules and other matters

on the case docket.

## FACTS & PROCEDURAL HISTORY

This case arises from a flower shop in Havre, Montana, called the Awesome Blossom

Rose Garden ("ABRG") that Earl Courtnage purchased and operated with the Warburtons.

**Background of the Parties.**

Linda Warburton testified that she and her husband John have resided in Havre for about

40 years.  She testified that she has been in the flower business since the 1970's.  Linda is known

around Havre as the "Rose Lady," and for 15 years she carried on a business selling roses and

small gifts such as teddy bears in Havre bars and other businesses at night.

Linda owned a flower shop called Country Mercantile in Helena from 1997 through 1999,

and owned another Country Mercantile in Havre.  Warburtons own a separate business entity

called "J & L Enterprises."  Ex. 5 is a bank account statement for J & L Enterprises.  In early-to-

mid 2009 Ex. 5 shows a number of overdrafts and NSF checks.  Linda denied that J & L

Enterprises had a cash flow problem, and she testified that the bank got it straightened out.

Ex. 7, 8, 9, and 10 are Warburtons' tax returns for years 2008 through 2011, all of which

were prepared by Kraske when she worked at H&R Block, except for year 2010.  Ex. 7, 8, and 9

all show nothing on the income line for wages.  Ex. 7 shows a business loss in the amount of

$2,353 for 2008, and also includes a Schedule C showing the business loss for a self-employed

person identified as Linda and her business name "J and L Enterprises."  Ex. 8 and 9 both show

no wages and a net operating loss ("NOL") of $2,353 for 2009 and 2010.  Kraske testified that

the NOL was brought forward from previous years when Linda's expenses were greater than her income.

Ex. 9 shows 2010 total income in the amount of $3,430.  Kraske testified that the Warburtons did not report to her that Linda received an inheritance in 2010, and Linda agreed that her $17,000 inheritance was not included in her tax return.  Neither was a check written to Linda from her father's estate in the amount of $2,420 reflected on her 2010 tax return.  Ex. 10 shows the $2,353 NOL for 2011, and shows wages in the amount of $11,524 for John[3].

Earl Courtnage, deceased, was about 75 years old and living on social security and his IRA when he died.  Earl had been employed at a mill in Great Falls until it closed, then he moved to Havre and worked for the city as a laborer until he retired.  Earl lived in Havre for about 25 years.  Before opening ABRG, Earl never owned a business and never was in a partnership.

Debra Swanson prepared Earl's tax returns since 1999.  She described Earl as "real conservative but also a giving person."  Swanson testified that she thought Earl was fairly well off, but conservative with his spending.  Earl testified that he saved about 20% of his earnings over the years, that he relied on professionals to handle his money, and that he put a lot of trust in people with whom he worked.

Mort Goldstein was Earl's best friend, neighbor and personal representative under Earl's last will and testament[4] pursuant to letters of administration issued by the Montana Twelfth Judicial District Court, Hill County.  Ex. 4.  Goldstein described Earl as a "super generous" man

---

[3]The W-2 for John's wages in 2011 was not included in Ex. 10.  Kraske testified that W-2 and other withholding papers would have been returned to Warburtons.

[4]Earl died on August 24, 2011.

4

who was a contributor in civic organizations and his church, and would give money to a stranger.

Earl had severe health problems, including chronic hypoxemia, cancer, coronary artery disease and COPD lung disease (emphysema). His doctor[5] described Earl as having some mild cognitive impairment, but it was not severe when he was on oxygen. Without oxygen, Earl's hypoxemia made him a "poor historian" who could not recall details.

**Havre Flower Shops Sales Breakdown.**

Kraske testified that she had her own flower shop in Havre for 9 years, until she closed it a year ago, at which she sold flowers and gifts. Kraske testified that her flower shop sales were comprised of approximately 25 percent (25%) cash sales, and the rest credit card sales.

Angela Pratt ("Pratt") owns and has operated a flower shop in Havre called "Wildflowers" for about 11 months, and has about a year and a half experience in the floral business. Pratt was called to testify about how customers pay for merchandise at flower shops. Pratt testified that about 50% of sales are by credit card, 30% are cash sales, and payment by check is about 20%. Around Valentine's Day, Pratt testified, the percentage of cash sales increases up to 40% because of last minute sales.

Asked about the breakdown in sales, Nicole Hanson testified that during the holidays ABRG and her previous employer at the same location would have more cash than credit card sales, that nearly all credit card sales were by phone, and that people who came in to pay for their charge accounts would pay by check. Hanson testified that cash sales were 33%, charge accounts

---

[5]Dr. Walter states in his deposition that he analyzed the reports on Earl prepared by Dr. Mazur. Walter stated out the outset that he was never able to see Earl during the time he was under the effects of chronic hypoxemia, so Walter would not be able to state that the hypoxemia affected Earl's cognitive function or executive function.

were 33% and checks were 33%.

Linda testified that, in her experience, people pay for flowers in cash only sometimes or "very little," and mostly pay by check and credit card. She testified that only 1% of ABRG's sales were cash transactions.

**Formation of ABRG.**

In Ex. 63, Earl's accountant Lynn Minnick ("Minnick") relates that Warburtons approached Earl at the Eagle's Club bar in Havre and asked if he wanted to purchase a flower shop with them. Earl agreed. Earl testified that Linda told him she had been in business for 25 years and he believed her.

Ex. 39 includes statements from a State of Montana Department of Labor & Industry Employment Relations Division ("DOLI"), Wage & Hour Unit compliance specialist, explaining that Linda approached Vicky Metzger, owner of the "Rose Garden" located in Havre, about buying the store, but Linda did not have enough capital. Ex. 39, p. 4. The Rose Garden was in Pioneer Village in Havre, a log complex which was owned by Joyce Hickman ("Hickman"). Linda told Metzger that Earl would provide financial backing, and Linda wanted to proceed with the purchase.

Earl purchased the Rose Garden flower shop business and stock from Metzger. Nicole Hanson was an employee of Metzger at the Rose Garden for about 8 years, and Hanson continued to work at the flower shop after Earl purchased Metzger's business until October 2009 when Linda fired her.

Randy Randolph testified that he met with Earl and the Warburtons in August 2009 and prepared a buy-sell agreement for Earl. Randolph testified that Warburtons were clients of an

6

attorney with whom Randolph shared an office, and that he has assisted Warburtons in minor legal matters.  Ex. 1 is the Buy-Sell signed by Earl as buyer and Metzger for Rose Garden Inc. on August 6, 2009.  Ex. 1 conveys all of the assets, fixtures, inventory, and a 1998 Dodge Van at 1401 1st Street in Havre, Montana, to Earl for the sum of $12,000.  Metzger testified that the sale included the cash register and credit card machine listed on the second page of Ex. 1.  She testified that she did not take any of the items listed on Ex. 1 after the sale.

Swanson testified that Earl had two personal bank accounts at Wells Fargo account, one of which (Account #6849) he used strictly for business, and another personal account at Bear Paw Credit Union.  Earl also had a Bear Paw Credit Union Visa credit card account.  Swanson testified that $10,088.50 came into Earl's Wells Fargo account to make the purchases of inventory, and $1,500 came into the credit card account.  Earl paid $12,228.19 from the credit card account for merchandise purchases for ABRG, and another $13,171.45 from the Bear Paw Credit Union personal account.

Randolph testified that he discussed with Earl and the Warburtons the nature of the business they were going to run as a flower shop.  In particular, Randolph testified that Linda was going to run the shop and Randolph suggested the parties create a partnership agreement but that never happened.  Earl told Randolph that Earl would work the details of the agreement out with the Debtors after the purchase.  Randolph was asked whether the Warburtons tried to dissuade him from testifying and he answered "No."[6]

Earl testified that he was in a partnership with Warburtons, and they were going to split

---

[6]Randolph explained that Warburtons contacted him over the telephone when his deposition was scheduled and told him that the depositions were not going to happen, but he told them he was going to attend the deposition pursuant to subpoena.

7

any profits 50/50.  Kaycee Groven testified that she was a friend of Earl's, and that Earl approached her at the Eagles Lodge bar where she worked and discussed the prospects of starting a floral shop with Warburtons.  Groven testified that Earl told her that when the shop made a profit he would divide it three ways:  One-third to Warburtons, one-third to Earl and one-third would go back into the business.

John testified that they were never asked to sign papers to become partners, and they were not partners with Earl.  Linda also testified that they were not partners in ABRG, but she admitted that she was a manager.  Minnick testified that John and Linda operated ABRG, and Earl's role was as financier or "silent partner."  Goldstein testified that they were partners from day one.  Hickman testified that Linda told her Earl was her "backer," and Linda had Earl sign the lease for the store.

Debtors testified that they contributed about $80,000 worth of inventory and invested cash into ABRG, and Linda testified that she gave Earl evidence listing the inventory which they contributed and its value.  John testified that Earl told them "Bring it on in and we will pay for it later."

Ex. 6 is records from John's Bear Paw Credit Union's account.  On page 06 27, Ex. 6 shows a $19,074.10 credit to the account dated 12/17/09.  John testified that was a deposit from a settlement of Linda's workmen's compensation injury claim from Louisiana[7] after Hurricane Katrina.  Linda testified that none of those funds were put into ABRG's operation.  Ex. 6 shows at p. 06 29 a cash withdrawal dated 1/4/10 in the amount of $18,980.  John testified that money

---

[7]Linda explained that she injured her neck and shoulder in a fall from a pickup owned by somebody who was supposed to be carrying workmen's compensation on her.

could have been put into the operation of ABRG, but he could not remember.  Ex. 6 shows at p. 06 32 a deposit in the sum of $4,699.55 on 9/2/10, followed on 9/8/10 by a cash withdrawal in the amount of $4,700.  John could not identify the source of the deposit, and could not see a corresponding entry on his 2010 tax return, Ex. 9.

Ex. 73 includes John's affidavits filed in state court proceedings in Hill County, Montana, in which John declared under penalty of perjury that he had no accounts as of July 2010, for purposes of seeking a waiver of filing fees and costs.  John testified that he must have mismarked the question because he was in a hurry, and he admitted that he had two checking accounts at the time he signed Ex. 73.  Linda also admitted that she had checking accounts at the time she stated under penalty of perjury, in her affidavits of inability to pay filing fees, that she had no accounts. Ex. 72.

Earl wrote the check for rent, which was given to Hickman each month, but Hickman testified that Earl was not present at the ABRG shop when she collected the rent check.  Earl testified that he paid all the expenses for ABRG, including the rent and power, and Warburtons paid nothing.

Swanson testified that, from Earl's records, she calculates that Earl contributed $46,327.14 from his accounts, plus another $20,000 for the purchase of inventory, including $12,228.19 purchased on Earl's credit card account.  Ex. 63 includes Minnick's description of the contributions.  Ex. 63 states at paragraph 5 that Earl and his wife contributed about $70,000, and Warburtons contributed about $8,500 to $8,900 cash, another $3,000 in purchases, and Linda contributed another $3,000 from her inheritance the week before the store closed to pay the bills. In addition Ex. 63 states that Warburtons contributed 2 or 3 pickup loads of inventory from

9

Linda's previous business in 2009-2010 until the store closed.

Earl testified that Linda told him they would contribute Linda's inheritance into the business, and that Warburtons deposited $8,000 into the Wells Fargo business account. Linda denied telling him that she would put any of her inheritance into ABRG, because they were not partners. Later she testified that she put $6,000 into ABRG, and in addition she purchased merchandise for which she was supposed to get a reimbursement. When pressed on cross examination how much money she put into ABRG, Linda answered that she could not remember. Goldstein testified that Linda deposited $8,160 of her money in the Wells Fargo bank account in January 2010.

Ex. 70 is a report to court of a distribution prepared by the attorney for the estate of Linda's father, dated April 16, 2010. Ex. 70 shows a check made out to Linda in the amount of $14,614.09, which Linda received, and a second check to Linda in the amount of $2,420, which Linda submitted as a claim against her father's estate for flowers.

On March 15, 2010, Ex. 5 shows a deposit in Debtors' J & L Enterprises account in the amount of $17,034.12 which Linda explained came from her father's estate, while she still was working at the ABRG store. Two days later, most of that money was withdrawn in cash.

Earl testified that Linda's funds from her inheritance or workmen's compensation settlement were to be put into ABRG. Linda, however, denied that she ever intended to put those moneys into ABRG. She testified that she used a portion of that money to purchase teddy bears and other product for ABRG and her private business, after Earl and Minnick told her that she would be paid back, but she was never repaid. Minnick testified that he told Warburtons, when Earl was getting cancer treatment, that Earl would pay them back if Warburtons put money out for

flowers.

Earl signed a check paying for ink for a fax machine from Office Equipment Company in Havre on September 16, 2009.  Ex. 87.  Linda stated that she and John owned the fax machine in the ABRG store.

**ABRG's Operations.**

Linda testified that she and Earl agreed to use the slogan "Home of the Rose Lady" in the business so that more people would come into ABRG.  They had business cards with that slogan printed up for ABRG.  Ex. 48.

Linda testified that she began working at ABRG on August 6, 2009, and worked there until the end of March 2010.  She described her responsibilities as a manager of the store, making sure the help was on time, and to "overlook the store," which she explained meant ordering the number and type of flowers and merchandise, storing them and keeping the store clean. Warburtons' son Steve testified that Earl hired him to work for ABRG as a laborer doing maintenance and odd jobs, and that his parents' job titles were managers.

Earl had Kaycee Groven do some bookkeeping for ABRG for about two and a half months in August to the beginning of October of 2009.  Groven also made some flower arrangements, but she testified that she was just doing a favor for Earl and did not request compensation.  Groven normally left her bookkeeping at the shop, but sometimes she would take her records and receipts home with her.

Nicole Hanson testified that, for the 2 months she worked at ABRG, she worked from opening until closing time at 5 p.m.  Hanson took phone orders, made floral arrangements and sent out deliveries.  She testified that Linda slept until afternoon and would only be at ABRG for

11

four hours per day at most while Hanson was there.

Minnick testified that Earl was not at ABRG on a day-to-day basis, and that Warburtons made most of the deposits into the bank account, although Earl "might have made some." Linda testified that she sometimes made deposits, but that most of the time Earl made the deposits.

Hanson testified that she began to ask customers for payment by check or credit card. She explained that she preferred not taking cash because she was concerned that no cash was being deposited into Earl's Wells Fargo account, and Earl was getting upset about it. She testified that Earl "blew up" and got very mad about an overwhelming amount of merchandise being ordered. On cross examination by Linda, Hanson testified that Earl "wanted to know why there was no cash deposits being made when he knew that there was cash taken in the day before." Hanson Dep., Dkt. 85, p. 33. Hanson testified that when she was paid in cash for sales, she wrote the serial number of the bills on a piece of paper and hid the paper behind a wall calendar "to cover my own behind."

Hanson testified that Linda continued to sell roses in bars and restaurants after hours during the time Hanson worked at ABRG. Linda testified that, for just one month while she worked at ABRG, she carried on her own long-time business selling roses and teddy bears in bars and restaurants at night, until it became too much. Linda explained that she ran that business for 10 to 15 years, but she denied carrying it on for several months after ABRG opened. She testified that she bought roses for her night business from the IGA, not from ABRG. Hanson disputed that, and testified that Linda had Hanson wrap ABRG flowers up for Linda to sell after hours. After Linda stopped selling on her own at night, she testified that she continued to sell teddy bears at ABRG, but only teddy bears which were purchased by Earl. Linda kept her own teddy bears in

12

the back room at ABRG, and she testified that she know which ones were hers and which were ABRG inventory.

Linda testified that there were several rolls of tape for the cash register when she first started working at ABRG in August 2009, but they ran out of tape and did not purchase any more. Ex. 88 is an invoice dated 12/2/2009, referencing cash register tape.  Linda testified that she paid cash for tape for the fax machine, which Linda took home with her because it belonged to Debtors.

Minnick testified that ABRG had financial problems and was losing money, and people in Earl's church, who Minnick labeled "sidewalk superintendents" and "Monday-morning quarterbacks," began "hooping and hollering" telling Earl how to run his business.  Goldstein testified that Nicole Hanson approached him and Earl at the Eagles Club and told Earl "how Linda was stealing cash from the store" and threatening Hanson.  Hanson testified that she told Earl that she thought Warburtons were ripping him off and that he was stupid to open up a business with them.

Groven testified that she quit working at ABRG because of her workload, and because Earl and Linda clashed.  Groven testified that Earl was upset with Linda's spending and lack of sales, and that Warburtons wanted to get paid and Earl did not agree because the business was not profitable, as there were more expenses than revenues.  Groven also testified that she advised Earl when she left ABRG "that things are bad" and told him that too much spending occurred and it was costing him too much money.

Linda asked Goldstein on cross examination if he has any proof that they "ripped off" Earl. Goldstein answered that he looked at the ABRG records and found there was no cash accounting,

13

no ledgers, and he saw that Linda charged more than $12,000 for merchandise on Earl's credit cards after Earl specifically admonished her not to charge anymore.

Goldstein testified that Earl told Linda to deposit cash receipts in his bank account every day, but Linda was not doing that and Earl was not getting cash sales deposited into his account. Groven testified that, at the end of her work at ABRG, she told Linda to deposit cash every day, but that cash did not get deposited except for a couple of times. She also told Warburtons not to order so many things. Groven testified that Linda asked her for her receipts and bookkeeping book after she left ABRG, and Groven returned them.

Linda testified that very little of the sales were cash sales, and when asked what that meant she answered: "There was very little cash that come into the store. Anything that come into the store was kept for Earl as a slush fund, as he requested." Linda asked Groven on cross examination if Earl ever said he had a slush fund, and Groven answered "No." Linda also asked Hanson on cross examination whether Earl said anything about a slush fund and Hanson answered: "Earl never said that. You said that, that's what you called it. I've never heard Earl say spend my money on food and taking people out. That's what you said." Hanson Dep., Dkt. 85, p. 33.

Linda testified the cash sales were only about one percent of sales because they had a lot of call-ins, but Linda did not keep a cash journal because "Earl said not to keep any of that." Earl testified that he got checks from Linda, but: "I never got any cash in the drawer. None, in seven months. Anytime I opened that drawer, there was quarters, nickles, dimes, pennies, maybe a buck or two for change for a $5 bill, but there was never any – I did not get any cash to take to the Wells Fargo, ever. Ever. Ever. Ever." On cross examination Earl testified that he received

14

"[d]amn few" checks and credit card slips at the store and he usually took them to Wells Fargo. He testified: "I knew I was getting ripped off."

Linda testified that she owned a store called Country Mercantile in Helena, and another in Havre. Linda used Country Mercantile receipts and paper for several sales in the ABRG store because, she testified, Earl asked her to use the Country Mercantile receipts and she was trying to use them up before using ABRG receipts. Ex. 29 has copies of receipts under the heading of both ABRG and Country Mercantile, but some of the Country Mercantile receipts are dated later than the ABRG receipts. Ex. 49 is an invoice from Havre print shop showing 500 ABRG invoices delivered and paid for by John on August 27, 2009. Linda testified that payments by check were made out to ABRG whether the invoice used was labeled ABRG or Country Mercantile. She simply used Country Mercantile invoices as paper to write down notes, and used the ABRG invoices to bill out to people instead of writing down their order.

Ex. 55 is a foam board advertisement of roses and teddy bears for sale at ABRG. Linda testified that Ex. 55 was prepared for a sale at ABRG on Valentine's Day, February 14, 2010. She testified that ABRG was open on that date, and she admitted that cash sales occurred on that date. She testified that she gave the cash receipts to Earl, and he took all of ABRG's workers out to dinner that night, which she assumed he paid for with that cash. Swanson testified that Linda approached her at dinner in February 2010 soliciting flowers. Linda denied that she was selling flowers when she saw Swanson that night, and she testified that Swanson saw her when Earl took the ABRG workers out to dinner for Valentine's Day.

Linda testified that she had no access to any of ABRG's funds. All credit card payments and all checks were deposited into Earl's accounts, Linda testified, and what little cash was given

15

to Earl and she has no idea what he did with it.  On cross examination Linda denied ever taking

cash from ABRG for her personal use.  On cross examination, Linda testified that cash receipts

could be deposited at night deposit which was available in Havre.

Earl testified that there never was cash in the drawer at ABRG whenever he went into the

store.  Linda explained that there would not have been cash because she took the cash out of the

till at night.  Plaintiff called Shirley Campbell ("Campbell") to testify on rebuttal.  Campbell

testified that she was in ABRG several times when Linda was working, and that about a dozen

times she observed Linda handling cash and removing cash from the register and placed it into her

purse.  Campbell heard Linda say that she didn't like to leave cash in the cash register at night.

Later, Linda testified that she took the money in the till home with her every night because it was

her own money, and Earl did not give her any money to open the till with.  She testified that she

put $100 of her own money in small bills into the cash register every day.

Hanson also testified that she saw Linda handle cash sales.  She testified that Linda would

put cash in the cash register.  However, Hanson testified that Linda used phrases such as "fun

money" to described the cash, and Hanson saw Linda take cash from sales and buy lunch for her

and Linda's son on more than ten occasions.  Hanson testified that, during the time she worked at

ABRG, about 1/3 of the sales she took in were cash.  Linda responded that if Hanson took in one-

third of her sales in cash "then she walked out with it."

Steve Warburton testified that Hanson was paid in cash "whenever she requested it, more

or less" because Earl did not want to pay into workers compensation or social security for the

employees.  Linda similarly testified that Earl did not pay workers comp or federal, state and local

taxes owed by ABRG.  Steve also testified that Hanson stole from ABRG, both out of the till and

16

from inventory.  On cross examination Steve testified that Linda raised the concern about Hanson's theft.  Hanson testified that Linda fired her on her birthday, and accused her of stealing money.[8]

Hanson testified that she told Earl about her hidden paper with her record of cash sales. She testified that she spoke to Earl, after she was fired, at the Eagles Club bar and told him about what she saw at ABRG and where her proof was behind the calendar, and that he gave her a portion of her last paycheck.

In September 2009 Earl wrote a check, Ex. 86, in the amount of $426.00 for 18 shirts described in Ex. 85.  Goldstein and Hanson testified that the shirts were for advertising by having people wear them in a Havre Festival Days parade.  John testified that the T-shirts were ordered for the business.  Earl's wife was given one shirt, and Goldstein testified that the other 17 are in Warburtons' possession and are not inventory in the store.  Asked whether the shirts belonged to the people whose names are inscribed on the shirts Goldstein answered "No," because Linda told Hanson that she had to return her shirts even after Hanson paid for them, and Linda kept all the shirts for herself and her relatives.  Hanson testified that she was forced to return all of her shirts even after she paid for them.

**Earl's Medical Treatment.**

Goldstein testified that in August and September of 2009 Earl went to several doctors and clinics and was diagnosed with stage 4 lung cancer.  Goldstein said Earl had a terrible time breathing.  Goldstein took Earl to Seattle by train at the end of November 2009 for 8 days of

---

[8]No evidence exists in the record that Hanson was ever charged with theft.  She testified that the police called her and told her it would be in her best interests if she dropped off the key and company shirts, and she did.

medical treatment.  Goldstein testified that Earl was in Seattle for cancer treatments on December 2, 2009, and December 8, 2009, when three cash deposits were made into Earl's Wells Fargo account in Havre, shown in Ex. 117-124.

When Earl and Goldstein returned to Havre after his cancer treatment, Goldstein testified that Earl could not pay for his train fare to return from Seattle on his credit card because Linda had charged his card to the maximum credit limit.  Earl returned to Seattle several times, and went to Houston twice and to Chicago for medical treatment.  Goldstein testified that Earl was away from Havre for over a dozen trips for medical treatment during at least a 120-day period.

**Minnick's Compilation.**

Earl testified that ABRG never made a profit, and that Warburtons charged his credit card up to $10,000 twice.  He asked Goldstein to check into his finances.  Earl also hired Minnick in early 2010 to provide a compilation accounting for ABRG to determine what had taken place at ABRG since June of 2009 until the first few months of 2010.  Minnick testified that his compilation is a summary of all income, expenses, bank accounts, and credit cards to try and determine what kind of revenue or expense problem was occurring at ABRG, and then ordinarily he would do a summary and a tax return.  Ex. 63 includes a billing statement describing Minnick's services regarding expanded technical issues at ABRG, such as is it a going concern, and how its problems could be corrected.

Earl brought Minnick 3 or 4 boxes full of ABRG's business records, and Warburtons gave Minnick other receipts.  Minnick testified that records were given to him piecemeal from the time he started until April 2010 when he finished his compilation.  Minnick testified that Linda or someone she delegated made summaries of the receipts from cash sales, checks and accounts

18

receivable, which were given to him.  Minnick testified:  "Whatever I asked, they gave me."  Cash register tapes were not turned over to Minnick, but sales receipts were turned over.

Ex. 29 is a set of sales receipts for ABRG sales, and includes a large number of receipts from "Country Mercantile" beginning from October 2009.  Minnick used the sales receipts, bank accounts, cancelled checks and accounts receivable and payable to prepare his compilation.

Minnick testified that most of ABRG's sales were by checks or charges, and he testified that there were not that many cash sales because the bank deposit slips did not list many cash deposits.  Minnick answered "Correct" when asked on direct examination "if the cash wasn't deposited, it wouldn't show up on the deposit slip."  Minnick also agreed that, from a general accounting standpoint, if inventory was sold for below cost it would reduce gross profit, and gross profit would be underreported if there were cash proceeds that were not being deposited.

Minnick explained that when ABRG was formed, they "guessed" at their inventory when the business was purchased from Metzger, and did not know for sure.  He testified that, a week or two before he finished his compilation, Linda gave him a fairly accurate inventory and he concluded that ABRG was losing money, which he explained most new businesses do when they first start up.  Minnick's second point was that the loss was almost double compared to what it was when he finally got a decent inventory.  Minnick testified that they all agreed to come up with a system of better internal controls and how to price, and try to turn the store around.

Minnick testified that he examined ABRG inventory that was not in the ABRG store on March 20, 2010, when he and Earl went to Warburtons' house and their son's house and saw several pickup loads of inventory, described as "X-mas inventory" and "Valentine's and bear boxes of inventory" in a semitrailer containers and a camper trailer.  Minnick testified that the

19

inventory was off-site because there was not room in the store.  Earl testified that he was not able to go inspect the ABRG inventory off-site, but that Minnick went and John let him into one trailer, but that inventory was not returned.

Linda also testified that she took Earl and Minnick and showed them what was stored off-site, and she testified that all items stored off-site were returned to ABRG prior to its closing.  On cross examination Linda was asked on what date she returned the off-site inventory and she answered that she cannot remember, but she sent the Plaintiff a calendar with the return date marked.  When pressed, Linda testified that they returned the inventory to the store after Christmas, or Valentine's Day, "somewhere in there."  On rebuttal Goldstein testified that Linda's testimony contradicted her deposition testimony where she tried to correct John's testimony that they returned the ABRG inventory from off-site in November 2010.  Goldstein testified that he was at the store in November, and that neither Warburtons nor anyone on their behalf came to the store to return anything.

When Minnick finished his compilation, he gave the business records back to Earl. Minnick testified that there probably still were some records that he did not receive, but that Earl had "fired" him and the missing records were no longer Minnick's concern.  Earl testified that he hired Minnick to do the accounting for the business but Minnick never did it, and Earl "figured he was working for Warburtons more than he was for me."[9]

**Winding Up ABRG.**

Minnick testified that the store closed about March 30, 2010, when Goldstein shut it down

_____

[9]Minnick was paid part of his fee due from Earl, but the rest is still in contention. Minnick testified that his firing was not a result of what Warburtons did.

and put a sign on the door.  Goldstein testified that he went to the store at Earl's direction on

March 30, 2010, to make sure the store was closed and to stop Earl's losses.  Goldstein testified

that he told Warburtons on March 30, 2010, that their partnership with Earl was over and they

would not be able to steal anything else from him.

Linda testified that the doors at ABRG were locked on March 31, 2010.  After that, she

testified, she was not able to resume her night business selling roses and teddy bears because her

basket and teddy bears were still at ABRG where she left them.[10]  She testified that Goldstein and

Earl told her she would be able to retrieve her items, but she could not reach Earl by phone and

she was not allowed into the store to get her items.

On rebuttal Goldstein denied telling Linda that she could retrieve her property and accused

her of perjury.  Ex. 42 is a log prepared by Denise Moore indicating that from 8-6-2010 to 10-5-10

Linda was a "no show" at ABRG.  Moore testified that she was told that Linda was directed or

allowed to show up at the ABRG store between 9 a.m. and 5 p.m., to either pick up Linda's items

or deliver items, but Linda never showed up.

Ex. 50 is a list of accounts receivable owed to ABRG, in the total amount of $948.50,

which Linda testified she gave to Earl or someone at ABRG after she stopped working there.

Goldstein testified that he had a letter served on Warburtons demanding the names of the people

who owed money to ABRG from Ex. 50, but they never provided the names.

Goldstein testified on rebuttal about Ex. 117 through 124, which are Wells Fargo Bank

records for Earl's account dba ABRG, for the period from August 2009 through March 31, 2010,

---

[10]Bronson and Linda argued about whether she tried to retrieve her teddy bears and other
personal property from ABRG.  Linda testified that she knew which bears were hers and which
were ABRG's, but the state court judge did not grant Linda relief to retrieve hers.

while Warburtons were running the store.  Ex. 125 is Goldstein's summary of Ex. 117 through

124, which he testified he prepared in consultation with Wells Fargo Bank personnel.  Goldstein

testified that Ex. 117 through 125 show that during that 175 period of banking days while

Warburtons ran ABRG, only 8 times[11] was cash deposited into the store account in the total

amount of $525, and no cash deposits were made during January, February or March of 2010.

Goldstein testified that there is no way to know how much ABRG cash Warburtons took

because they produced no cash register tapes, no daily journals, logs or anything else to indicate

the amount of cash sales.  Linda testified that Earl never paid Warburtons to operate ABRG, and

did not pay anyone except Hanson and one other person.

Goldstein testified that Earl went to the state district court to get orders to sell all the

ABRG's property and get the creditors, vendors, landlord, and bills owed everyone else paid off.

Denise Moore testified that Earl asked her to help him inventory and sell what was left of

ABRG's inventory.  Moore testified that the liquidation took several months.  Moore was paid for

her help, but she testified she did not ask for it.

Goldstein testified that he and Earl were in the store in April 2010 trying to figure out how

to liquidate the assets and pay the bills when a man entered and wanted to pay a $50 bill he owed

ABRG for a prior purchase of which there was no record.  Soon thereafter, Goldstein testified,

two women entered and purchased $60 in merchandise for cash.

Earl sent Linda a letter, Ex. 3 dated April 8, 2010, asking for a detailed accounting of the

flower shop, the names, addresses and phone numbers of people who obtained merchandise from

---

[11]Three cash deposits made in September 2009; three in November; 1 in September,
which totals 7 cash deposits.

ABRG without paying, sales records, cash receipts, location of any ABRG merchandise not at the shop, computer and electronic records of sales and purchases, and gifts acquired by Linda paid from Earl's accounts.  Goldstein typed up Ex. 3, and Earl added some handwritten notes and signed it and it was served on Linda by the deputy sheriff on April 8, 2010.

Linda testified that she received Ex. 3.  She testified that Goldstein gave away or sold all of ABRG's property without notifying Debtors, without itemizing it and without keeping records of what was sold.  She testified that the computer which she had at the ABRG store was hers and was not used for the business.[12]  She testified that she bought the computer with her inheritance and does not know where it is or how much she paid for it.  Goldstein was unable to find the fax machine for which Earl had purchased ink.  Linda testified that the fax machine was hers and she took it home.

Asked about each of the items listed in Ex. 3, Goldstein testified that none of the names and addresses requested in Ex. 3, or sales records, or computer and electronic records were ever provided by Warburtons.  Linda testified that she returned "anything that I had in my possession at that time" including checks, to Randolph.  She testified that she tried to call Earl several times but he would not answer.

Goldstein testified that Warburtons never allowed him to inspect their property or their relative's property for ABRG inventory, and they never produced a computer for two and a half years even after they admitted having a computer.  Goldstein testified that he found an empty box for a Dell computer and electrical hookups next to a desk in the ABRG store.

Linda delivered checks to attorney Randolph, which should have been deposited in the

---

[12]She testified that they played games on the computer at the store.

bank account a month earlier, and Earl picked them up.  Linda left a box at Randolph's office

which contained names and amounts of the checks, which Earl listed on Ex. 15, dated April 26,

2010.

Ex. 19 is a list of jewelry inventory in a box, listing 166 items individually marked with a

price, and with a total value of $1,585.91.  Moore testified that she prepared and listed the items

in Ex. 19, that they were located in a brown box in the ABRG store, and that she inventoried

everything else in the store.  The price information for each piece was marked on each item of

jewelry with a sticker.  Goldstein testified that the prices were in Linda's handwriting, and that

there was no other box of jewelry.

Janine Donevan is a jeweler who operates J.M. Donevan Designs in Fine Jewelry in

Havre.  Donevan testified as an expert, and she performed an appraisal of the value of the jewelry

in the box itemized in Ex. 19, which Goldstein brought her on August 21, 2012.  Ex. 68 is

Donevan's appraisal opinion of the box of jewelry.  Donevan testified that she examined each

item in the box individually and microscopically, and visited the shop on August 31, 2012.

Donevan described the majority of the items in the box as "costume jewelry."

In Ex. 68 Donevan values the items in the box at from a total value of $209 wholesale to

$1,044.92 total retail value, with some items valued at $0 because they appear to be used and in

poor condition.  Other items in the box were used, and described as in fair to moderate condition,

and some were new.  Donevan testified that closeout or going-out-of business sales for this

industry usually range from 10 cents to 40 cents on the dollar.  Linda testified that the box

Donevan examined is not the box Linda listed in Ex. 126 with a value of $8,000 because it did not

have enough jewelry in it.

24

Goldstein testified that the store finally closed its doors in November 2010 after most the inventory had been disposed of by bulk sales and closeout sales, and a walk-in cooler was taken apart and sold. Some items that did not sell were kept in storage where they continued to incur costs until Goldstein found a garage to use. Goldstein testified that a little over $19,000 was received from the close-out sales, and what remains are the items in the box worth $209 wholesale.

Ex. 83 is a note found among a box of things which Minnick turned over to Earl. Ex. 83 refers to $100 cash paid for a snow blower on December 4, 2009. Earl thought Warburtons bought the snowblower with money from ABRG without his authorization, and that they used it at the store at one time. Goldstein testified that he never found a snowblower at the ABRG store, and never found any records showing that Warburtons paid the store $100. John testified that Ex. 83 reflects when he purchased a snowblower, which Linda probably heard about on TRadio, with John's own money for his personal use. Linda testified that John paid for the snow blower out of his own social security check, and that is why she wrote on Ex. 83 "John and Linda." Steve Warburton testified that he was present when John purchased the snowblower, and that John paid the seller with a $100 bill.

Earl and his wife sued Warburtons in the Montana Twelfth Judicial District Court, Cause No. DV-10-99. Ex. 84 is an "Order for Temporary Restraint" entered in that case, barring Warburtons from interfering with a planned sale of inventory by Earl, and directing Warburtons to return any inventory for sale. Goldstein testified that Warburtons did not comply with Ex. 84 to return inventory. Goldstein got permission from the state court to pay creditors with the proceeds of the close-out sales.

25

Ex. 126 is a list which Linda testified she filed in the district court on August 25, 2010, listing some but not all of the ABRG inventory that was brought to ABRG.  She agreed that Ex. 126 was all she could remember of the ABRG inventory from memory.  Goldstein testified that approximately $9,700 worth of Christmas items, which Warburtons had stored of-site, were not in the store inventory prepared by Moore.  Goldstein testified that he never got to inspect the trailers or depose Warburtons' daughter and son-in-law because there was no signed order.  Goldstein testified that Warburton's avoided depositions in the state court case, and when Linda appeared at the second deposition she answered every question with "no comment."

Ex. 74 is an order on plaintiffs' motion for sanctions dated July 18, 2011, awarding sanctions against the Warburtons in the total amount of $3,134.29 in relation to discovery motions.  The court took plaintiffs word that Warburtons "stonewalled counsel and refused to answer any questions" at deposition.  Ex. 74.  Earl was still alive at the time Ex. 74 was entered, but he did not get paid that award.  Goldstein as Earl's personal representative tried to collect the award but was not successful.

**Warburtons' Wage Claims.**

Warburtons brought wage claims against Earl in the Montana Department of Labor and Industry Employment Relations Division – Wage and Hour Unit.  Goldstein testified that Warburtons asked for an award of more than $300,000 against Earl for wages at $100,000, penalties, $80,000 for inventory, and $15,000 for cash Warburtons claimed they contributed into the store.

Ex. 37 is a copy of John's wage claim filed in April 2010 for work he performed at ABRG.

26

Ex. 39 includes the opinions from the DOLI wage and hour unit dismissing Linda's and John's wage claims.  The DOLI compliance specialist determined that the four elements of a partnership were present[13] and dismissed Linda's claim.  Ex. 39, p. 5.   John agreed that his wage claim also was dismissed because the compliance specialist determined that John had been a partner of Earl's, not Earl's employee.  Ex. 39.   John and Linda requested a redetermination, but the Wage and Hour Unit did not change its determination.

Ex. 36 is Linda's similar wage claim, and Linda testified that her wage claim also was dismissed.  Ex. 39 is the decision on Linda's wage claim.  John and Linda appealed those determinations administratively to a hearings officer, and both of their appeals were dismissed.  Warburtons appealed those administrative decisions in the state district court, and their appeal was dismissed on December 22, 2011.  Linda testified that their appeals were dismissed as untimely.  Warburtons have filed no further appeals of the DOLI's decisions that the Warburtons and Earl had been partners.[14]

Despite the DOLI decisions that they were partners, Linda insists that they never were partners and "it was only done with smoke and mirrors and Mort Goldstein out to get us."  Steve Warburton filed a wage claim of his own against Earl's estate.  Ex. 14 is the settlement agreement between Steve and the estate settling Steve's claim for $4,900 in November 2011, before a

---

[13]The 4 elements cited in Ex. 39 are (1) The parties clearly manifest their intent to form a partnership; (2) Each party contributes something to promote the partnership; (3) Each party has the right of mutual control over the subject of the partnership; and (4) There is an agreement among the parties to share the profits of the enterprise. *Bender v. Bender*, 144 Mont. 470, 480, 397 P.2d 957, 962 (1965).

[14]Linda testified that they may have grounds for an appeal still, because the judge had a conflict of interest.

27

hearing.

**Bankruptcy Case/Adv. No. 12-00018.**

Linda testified about litigation against Warburtons brought by Bear Paw Credit Union, which sued them to obtain possession of their home after foreclosure.  Linda had cash from her inheritance and workmen's compensation claim, but she testified that Bear Paw Credit Union would not talk to her.  Warburtons also had a judgment against them in favor of a Mr. Short.  Linda testified that she tried to pay Short off but he would not take the money.

Warburtons filed a voluntary Chapter 13 petition commencing this case on January 9, 2012.  The case was converted to Chapter 7 by Debtors on January 30, 2012.  Debtors filed their Schedules on February 7, 2012, listing assets with a total value of $13,754.73 consisting mostly of two vehicles and a 5th wheel trailer, and liabilities totaling $147,392.64.

Schedule B does not include any of the Christmas or Valentine's day ABRG inventory which Goldstein had valued at $9,700 and had been stored off-site on property of the Warburton family members.  Debtors amended their Schedule B to add at item 16 ("Accounts Receivable") joint property valued at $80,000 described as "owed to Debtors from flower business with Earl Courtnage," and added at item 21 "Wrongful taking of property – Earl Courtnage Estate" with no stated value.

Schedule F lists $107,392.64 in unsecured nonpriority claims, the majority of which is the claim of "Earl Courtnage Estate" in the amount of $70,000 from a "2010 Lawsuit."  Originally that claim was not marked as contingent, unliquidated or disputed, but Debtors' amended Schedule F on May 2, 2012, to mark it as contingent and disputed.

On Debtors' Statement of Financial Affairs, they checked the box below "None" at items

10 ("Other transfers" of property other than in the ordinary course within two years preceding the commencement of the case), and item 14 ("Property held for another person").[15]

The Trustee filed a notice of intent to sell the estate's interest in the ABRG partnership to the Courtnage Estate for $1,000. The Debtors filed an objection (Dkt. 35[16]) which states in part: "The Debtors believe that it is not in the best interest of the Estate to allow the Trustee to sell the partnership interest and forego this additional asset to the Estate." After a hearing held on July 13, 2012, the Court entered an Order (Dkt. 53) overruling Debtors' objection and authorized the Trustee "to sell the estate's interest in a partnership interest in the Awesome Blossom Rose Garden to the Estate of Earl Courtnage for the sum of $1,000.00." Goldstein testified that he paid the Trustee for the partnership interest.

On October 1, 2012, the Trustee filed a notice and motion for approval to sell to the Courtnage Estate any claims or interest of any nature the estate has in or against Earl Courtnage or the Courtnage Estate for the sum of $1,000. When no objection was filed within the notice period the Court entered an Order (Dkt. 58) on October 22, 2012, approving that sale to the Courtnage Estate for $1,000. Goldstein testified that he paid the Trustee for that interest.

The Courtnage Estate filed Proof of Claim No. 15 on June 1, 2012, asserting an unsecured nonpriority claim in the amount of $73,934.29 based on "Damages for fraud, theft, partnership accounting." No objection to Claim 15 has been filed, and it is deemed allowed under 11 U.S.C.

---

[15]Depending on the date of Warburtons' alleged return of the off-site ABRG inventory, they returned it as Linda testified on Valentine's Day 2010, then Debtors were required to report the transfer within two years of the commencement of the case at item 10. If they still have the ABRG inventory they were required to list it at item 14.

[16]The objection was filed by Debtors' attorney of record Gary S. Deschenes, who filed a motion to withdraw as Debtors' attorney on the same date.

§ 502(a).[17]

Plaintiff filed the complaint initiating this adversary proceeding on April 19, 2012.  The complaint avers the following claims for relief:  First Claim (seeking exception from Debtor's discharge for false pretenses and fraud under § 523(a)(2); Second Claim (exception from discharge under § 523(a)(4) for fraud by a fiduciary and defalcation); Third Claim (exception from discharge under § 523(a)(6) for willful and malicious injury by conversion and retention of Courtnage's capital account and his share of profits; Fourth Claim (denial of discharge under § 727(a)(2)[18] alleging Debtors, with intent to hinder, delay or defraud, removed, concealed, or destroyed the financial books of the partnership); and Fifth Claim (denial of discharge under § 727(a)(3) alleging Debtors concealed, destroyed, or failed to keep or preserve recorded financial books of account of the partnership).

## DISCUSSION

The above extended narrative includes conflicting testimony, and accusations by both sides contesting the credibility of each other's witnesses.  Plaintiff argues that Debtors were not honest with Earl, that they committed defalcation and embezzlement, and that Linda is a liar and committed perjury at trial.  Debtors contend that Earl cheated on his taxes and kept a slush fund, and that Nicole Hanson is a thief.  It is therefore necessary for the Court to determine the credibility of the Debtors and other witnesses.

---

[17]Section 502(a) provides:  "A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects."

[18]The complaint states the Fourth Claim is based upon § 727(a)(1), which clearly is a typo.

### I. Credibility.

Evaluating the weight to be assigned to witness testimony and other evidence is the province of the bankruptcy court. *See Groves v. Pickett*, 420 F.2d 1119, 1126 (9th Cir. 1970). Based upon Linda's and John's testimony which conflicts with their prior sworn statements, and inconsistencies in Linda's testimony, and having observed Linda's and John's demeanor while testifying under oath and cross examination, the Court concludes that Linda and John are not credible witnesses, and neither is their son Steve. *Allen v. Iranon*, 283 F.3d 1070, 1078 n.8 (9th Cir. 2002); *In re Taylor*, 514 F.2d 1370, 1373-74 (9th Cir. 1975); *Anderson v. City of Bessemer, NC*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *see also Casey v. Kasal*, 223 B.R. 879, 886 (E.D. Pa. 1998).

The evidence shows that Linda and John made sworn statements in the state district court that they had no bank accounts when they applied for fee waivers. Ex. 72 & 73. However, Ex. 6 shows that John had bank accounts at the time they made those sworn statements under penalty of perjury. Statements made under penalty of perjury to a court are serious matters, notwithstanding Debtors' contentions that they simply made a mistake on Ex. 72 and 73 while in a hurry, and this evidence of Warburtons' false statements under oath undermines their credibility as witnesses, unless their testimony can be corroborated by other evidence.

In particular, the Court notes that Linda changed her testimony several times, depending on the particular question before her. She testified that she would not contribute her inheritance because no partnership existed, but when shown that she agreed to contribute her inheritance she explained that it was on the condition that she be repaid.

Linda called Hanson a thief, and accused Earl of maintaining a slush fund. Linda and

31

Steve accused Earl of not wanting to comply with the law governing workers compensation, social security for the employees, or federal, state and local taxes owed. No evidence exists in the record to support any of these accusations, which Debtors made against the deceased and Hanson to undermine their testimony. The witnesses at trial included Debra Swanson, who prepared Earl's tax returns since 1999, another accountant Minnick, and Earl's personal representative Goldstein, all of whom had knowledge of Earl's finances. Debtors did not ask a single question of these witnesses seeking information to support their theory that Earl sought to evade taxes or compliance with workers compensation, social security, or tax requirements. Debtors did not establish how their son Steve, who Earl hired simply as a laborer at ABRG, had foundation to testify on the issue of Earl's intent not to comply with state and federal laws. Their accusations are nothing more than a smear on the deceased's reputation, when Earl is not able to defend himself.

No evidence exists in the record, other than Linda's and Steve's testimony, that Hanson stole anything. Hanson was not prosecuted, and the evidence shows that she accepted her firing, turned over her key and the shirts, even though she had paid for the shirts, and told Earl about the cash sales and her hidden records. Debtors' accusations against Earl and Hanson were made to deflect Plaintiff's accusations and testimony of Earl, Hanson, and Groven, who each testified that Linda failed to deposit cash receipts daily as Earl demanded.

Plaintiff impeached Linda by pointing out her and John's conflicting testimony about when they returned the ABRG inventory, which they had kept on family property off-site, the date of which changed from November 2009 to Valentine's Day of 2010. Uncontroverted evidence exists in the record that the Warburtons stored ABRG inventory off-site, which the evidence

32

shows had a value of $9,700, but no evidence exists other than Debtors' testimony that the inventory was ever returned.

Goldstein testified that no off-site inventory was returned.  His testimony is corroborated by Moore, who was at the store after it closed and prepared an inventory, which did not reflect the off-site inventory being returned, and Moore testified that she did not see Warburtons return anything.  Linda has been in business for 25 years.  She did not produce a receipt signed by Goldstein evidencing that Warburtons returned the off-site inventory, or produce anything else in writing, which an experienced businessperson would reasonably expect to request to show delivery.  Debtors' uncorroborated testimony that they returned the off-site inventory simply is not credible.  The Court finds that the Debtors failed to return the off-site inventory.

In addition, Debtors signed their Schedules and Statement of Financial Affairs under penalty of perjury.  Their Schedule B and amended Schedule B both fail to list the off-site inventory, making another instance of a false sworn statement.  If they still retain the off-site inventory they were required to list it on Schedule B and/or item 14 of the Statement of Financial Affairs.  If they returned it they were required to list that return at item 10 if they returned it within two years of the date of commencement of their case.

At trial Debtors insisted that they were not partners of Earl, but rather managers.  That testimony is inconsistent with their statement in their objection filed in the main case (Dkt. 35) to the Trustee's motion to sell the partnership interest.  While in this adversary proceeding they continue to argue that they were not partners, in Dkt. 35 in the main case Debtors argued that they "believe that it is not in the best interest of the Estate to allow the Trustee to sell the partnership interest and forego this additional asset to the Estate."  This inconsistency builds upon those listed

33

above, and further undermines Debtors' credibility.

One last inconsistency in Linda's testimony is demonstrated by the bank records, Ex. 117-124. Those exhibits and Goldstein's testimony that Earl was out of town for medical treatment on the dates the bank statements show some cash deposits were made into the accounts, and therefore undermines Linda's testimony that Earl made all deposits, and that Earl kept cash in a slush fund. As the result of these inconsistencies, this Court finds and concludes that Linda and John are not credible witnesses, and the Court will not give probative weight to their testimony unless it is supported by other credible evidence.

### II. 727(a) – Objections to Discharge

Certain guiding principles are common and apply to each of Plaintiff's claims for denial of discharge under § 727(a). First, "[a] claim for denial of discharge under § 727 is construed liberally and in favor of the discharge and strictly against a person objecting to the discharge." *In re Retz*, 606 F.3d 1189, 1196 (9th Cir. 2010); *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005) (citing *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986)); *In re Stokes*, 451 B.R. 44, 81-82 (Bankr. D. Mont. 2000). The principal purpose of the Bankruptcy Code is to grant a "fresh start" to the "honest but unfortunate debtor". *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367, 127 S.Ct. 1105, 1107, 166 L.Ed.2d 956 (2007). The "fresh start" is explained by the Ninth Circuit Bankruptcy Appellate Panel in *In re Albarran*, 347 B.R. 369, 379 (9th Cir. BAP 2006):

> The general policy of bankruptcy law favors allowing an honest debtor to discharge debts and to make a fresh start free from the burden of past indebtedness. *See Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970). Thus, because a debtor in bankruptcy is assumed to be poor but honest, there is a presumption that all debts are dischargeable unless a party who

34

contends otherwise proves, with competent evidence, an exception to discharge. *See Brown v. Felsen*, 442 U.S. 127, 128-29, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); Hon. Barry Russell, BANKRUPTCY EVIDENCE MANUAL ¶ 301.60, p. 870 (2006 ed.).

The corollary to this policy is that only the "honest but unfortunate" debtor is entitled to an entirely unencumbered fresh start. *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

*Grogan v. Garner*, in further explaining the "fresh start" policy of the Bankruptcy Code, states that "a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)." 498 U.S. 279, 286, 111 S.Ct. 654, 659 112 L.Ed.2d 755 (1991). Second, the party seeking to deny the debtor's discharge bears the burden of proof, which under § 727 is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. at 289; *In re Searles*, 317 B.R. 368, 376 (9th Cir. BAP 2004), *aff'd.*, 212 Fed.Appx. 589 (9th Cir. 2006).

**A. Fourth Claim – § 727(a)(2).**

Plaintiff's Fourth Claim for relief objects to Debtors' discharge under § 727(a)(2), which provides that the court shall grant the debtor a discharge unless –

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition.

35

606 F.3d at 1200; *Hansen v. Moore (In re Hansen)*, 368 B.R. 868, 876 (9th Cir. BAP 2007); *Stokes*, 451 B.R. at 83.

A party seeking denial of discharge under § 727(a)(2) must prove by a preponderance of the evidence: "1) a disposition of property, such as transfer or concealment, and 2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property." *Stokes,* 451 B.R. at 83, quoting *Retz*, 606 F.3d at 1200 (quoting *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir. 1997))

The testimony of Minnick, Goldstein, Moore, and Linda establish that the Debtors transferred and concealed ABRG inventory valued at $9,700 off-site on property of Warburtons and their family members.  Debtors' testimony that they returned the off-site inventory is not credible, and the Court finds that Debtors continue to hold the off-site inventory and failed to include it in their sworn Schedules and Statement of Financial Affairs.  If the property is partnership property then Debtor's share of the partnership property was property of the estate, and if Debtors were correct that no partnership existed then all the off-site property is property of the estate which the Debtors failed to list in their Schedules and Statement of Financial affairs.  Based on this, the Court finds that Plaintiff has satisfied the first requirement of § 727(a)(2) showing concealment or disposition of property by Debtors.

Plaintiff's burden remains to show subjective intent by the Debtor to hinder, delay or defraud.  *Stokes*, 451 B.R. at 83.  Constructive fraudulent intent can not be the basis for denial of discharge.  *Adeeb*, 787 F.2d at 1343.  However, it is sufficient under the plain language of § 727(a)(2)(A) to deny discharge upon a showing of intent to hinder or delay or defraud creditors. *Stokes*, 451 B.R. at 83; *Searles*, 317 B.R. at 379.  In other words, intent to defraud need not be

36

shown because mere proof of intent to hinder or to delay is sufficient. *Stokes*, 451 B.R. at 83; *Wolkowitz v. Beverly (In re Beverly),* 374 B.R. 221, 243 (9th Cir. BAP), citing *Searles*. Intent may be inferred from surrounding circumstances including "badges of fraud" that constitute circumstantial evidence of intent, or a course of conduct. *Stokes*, 451 B.R. at 83; *Retz*, 606 F.3d at 1200 (citing *Emmett Valley Assocs. v. Woodfield (In re Woodfield)*, 978 F.2d 516, 518 (9th Cir. 1992)).

The Court infers that Plaintiff has satisfied the second requirement of § 727(a)(2) showing intent by the Debtors to hinder, delay or defraud, based on the circumstantial evidence of intent and Debtors' course of conduct. Warburtons moved the ABRG inventory off-site and kept it on their own property or on property of family members, as shown by testimony of Minnick, Earl, Goldstein and Linda. Linda's testimony that Warburtons returned the off-site inventory is not credible, and is contradicted by testimony of Goldstein and Moore. Debtors failed to list the off-site inventory in their sworn Schedules, and failed to list their alleged transfer of it back to ABRG in their Statement of Financial Affairs. This Court finds such evidence sufficient by a preponderance of the evidence to conclude that Plaintiff has satisfied the second requirement of intent to hinder, delay or defraud, and judgment shall be entered under Plaintiff's Fourth Claim for Relief denying Debtors' discharge under § 727(a)(2).

**B. Fifth Claim – 727(a)(3).**

Plaintiff's Fifth Claim for Relief seeks denial discharge under § 727(a)(3), which requires the Court grant a discharge unless –

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might

37

> be ascertained unless such act or failure to act was justified under all the circumstances of the case;

*Zavarelli v. Christopherson (In re Christopherson)*, 9 Mont. B.R. 54, 55 (Bankr. D. Mont. 1990).

Plaintiff contends that Debtors removed, concealed, destroyed or failed to keep or preserve the partnership's books of account or financial records from which the partnership's business transactions may be ascertained and assets traced back to the Warburtons. Plaintiff must show (1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions. *Caneva v. Sun Cmtys Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755, 761 (9th Cir. 2008); *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1296 (9th Cir. 1994). After showing inadequate or nonexistent records, the burden of proof shifts to the debtor to justify the inadequacy or nonexistence of records. *Caneva*, 550 F.3d at 761-62.

Goldstein testified that the Debtors failed to produce records of cash sales or receipts, and very little was produced in the way of cash receipts or deposits. Minnick testified that a lack of a record of cash deposits will result in understated gross revenues.

Debtors admit that Linda took cash out of ABRG at night, but they argue that she did not want to leave cash in the business at night for safety, and they contend that they deposited any cash taken into the business's bank accounts, or alternatively that they merely took it home at night and returned it the next day to be again placed in the till. However, the testimony of Earl, Groven, and Hanson, and the bank records admitted, establish that Linda did not make daily deposits of cash receipts as Earl demanded. Linda's testimony that Earl made all cash deposits is not credible. What few cash deposits are shown by the record were made while Earl was away for

38

cancer treatments.  Earl trusted and relied on Linda as an experienced businessperson, but she kept the cash receipts for herself or spent it rather than depositing cash every day as Earl demanded, just as she ignored Earl's demand that she stop charging on his credit card.

Plaintiffs refer to the witness testimony that 25% to 40% of the sales were paid in cash, but little cash was deposited and Linda was observed on several occasions taking cash from the till and putting it in her purse, took partnership assets and stored them off-site.  Debtors argue "we know the cash sales are very low."  Plaintiff contends that Debtors' argument that cash sales were low is unsupported by the evidence.  Linda's testimony that cash sales were only 1% of sales conflicts with Hanson's testimony that one-third of sales were cash.  Debtors' disparage Hanson as a thief unworthy of belief, but other witnesses with experience in retail flower shops in Havre testified similarly to Hanson.

Kraske testified that her sales were approximately 25% cash sales.  Pratt testified that 30% of her sales are cash sales, and that percentage rises to 40% during holidays.  Debtors offered no evidence that Kraske and Pratt are dishonest, mistaken or unworthy of belief, and their testimony more or less corroborates Hanson's testimony, and Earl's, that cash sales were significant and were not being deposited or otherwise recorded, except by Hanson.

When a debtor is sophisticated and carries on a business involving substantial assets, "creditors have an expectation of greater and better record keeping."  *Caneva*, 550 F.3d at 762, quoting *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 970 (7th Cir. 1999) (citing *In re Juzwiak*, 89 F.3d 424, 428 (7th Cir. 1996)).  Earl agreed to enter into business with Warburtons based on Linda's assertion that she had 25 years experience in business.  Earl trusted and relied on Linda to provide business expertise, which includes adequate record keeping.  Warburtons failed to make

39

daily deposits of cash receipts at ABRG, and failed to record cash transactions or how Warburtons disposed of the cash. Minnick testified that the state of ABRG's records made it difficult if not impossible even to determine the extent of its losses because of the uncertainty of ABRG's inventory. The Court finds that such failure by Debtors to maintain and preserve adequate records makes it impossible to ascertain the Debtors' financial transactions and material business transactions. *Caneva*, 550 F.3d at 761-62; *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1296 (9th Cir. 1994).

If a creditor establishes a prima facie violation of § 727(a)(3), a debtor may show that he or she still is entitled to a discharge by showing that the failure to keep or preserve records was justified under the circumstances of the case. *Caneva*, 550 F.3d at 762-63; *Cox*, 41 F.3d at 1296-97. The Court finds that Warburtons have made no such showing. They insist that no partnership existed and that they were not responsible for the state of ABRG's records because Earl hired professional accountants, ignoring the fact that Earl entered into the business based solely on Linda's claimed business expertise.

For the above reasons, the Court concludes that Plaintiff stated a prima facie case under § 727(a)(3), the burden of proof shifted to Warburtons. They failed to justify the inadequacy or nonexistence of ABRG records, and failed to show that they are nonetheless entitled to discharge because their failure to keep or preserve records was justified under the circumstances of this case. *Caneva*, 550 F.3d at 761, 762-63; *Cox*, 41 F.3d at 1296-97. Judgment shall be entered under Plaintiff's Fifth Claim for Relief denying Debtors' discharge under § 727(a)(3).

### III.  § 523(a)(4)

Exceptions to discharge should be strictly construed against an objecting creditor and in

40

favor of a debtor in order to effectuate the fresh start policy afforded by the Bankruptcy Code.

*Moore v. United States Department of Education, et al.*, 17 Mont. B.R. 106, 108 (Bankr. D. Mont.

1998); *In re Klapp*, 706 F.2d 998, 999 (9th Cir. 1983).   The standard of proof for the

dischargeability exceptions under § 523(a) is by a preponderance of the evidence.   *Grogan v.*

*Garner*, 498 U.S. at 291, 111 S.Ct. at 661, 112 L.Ed.2d 755 (1991); *Donath v. Sage*, 15 Mont. B.R.

40, 43 (Bankr. D. Mont. 1995).

Section 523(a)(4) provides that a  discharge under section 727 does not discharge an

individual debtor from any debt . . . "(4) for fraud or defalcation while acting in a fiduciary capacity,

embezzlement, or larceny."  To prevail on their § 523(a)(4) claim, Plaintiff is required to establish

(1) that Debtors were acting in a fiduciary capacity, and (2) that Debtors committed a "defalcation"

in that capacity.  The scope of the term "fiduciary capacity" under § 523(a)(4) is a question of

federal law.  *See Mills v. Gergely (In re Gergely)*, 110 F.3d 1448, 1450 (9th Cir. 1997).

The Ninth Circuit has adopted a narrow definition of "fiduciary" for purposes of § 523(a)(4),

requiring that the fiduciary relationship arise from an express or technical trust that was imposed

prior to the wrongdoing that caused the debt.  *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th

Cir. 1996).  Similarly, in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79

L.Ed. 393 (1934), the Supreme Court instructed that the term "fiduciary capacity" is narrower here

than it is in some other contexts:  Section 523(a)(4) covers only "express" or "technical trusts" and

not trusts arising out of "the very act of wrongdoing."  *See also Cal–Micro, Inc. v. Cantrell (In re*

*Cantrell)*, 329 F.3d 1119, 1125 (9th Cir.2003) ("The broad, general definition of fiduciary—a

relationship involving confidence, trust and good faith—is inapplicable in the dischargeability

context.... The fiduciary relationship must be one arising from an express or technical trust that was

41

imposed before and without reference to the wrongdoing that caused the debt.").

In Montana, a partner owes fiduciary duties to the partnership and other partners by statute, including duties of loyalty and good faith and fair dealing. MONT. CODE ANN. ("MCA") § 35-10-405; *McCormick v. Brevig*, 2007 MT 195, ¶ 68, 338 Mont. 370, 385, 169 P.3d 352, 363. Thus, if they were partners of Earl, Warburtons are fiduciaries of the Plaintiff even by the narrower definition of fiduciary under the first element of § 523(a)(4).

Debtors argue no partnership existed. Plaintiff argues that a partnership existed, and that even if no partnership existed Warburtons still owed Courtnage a fiduciary duty if they were managers since they were entrusted with ABRG's assets.

The existence of a partnership was decided in the DOLI administrative proceedings, which found that a partnership existed. Ex. 38, 39. Warburtons appealed the administrative proceedings, and appealed the dismissal to the state district court which dismissed their appeal. The DOLI's determination that a partnership existed is final.

The test in Montana to apply issue preclusion (collateral estoppel) is stated in *In re Estates of Swanson*, 2008 MT 224, ¶ 16, 344 Mont. 266, 187 P.3d 631:

> (1) the issue decided in the prior adjudication is identical with the one presented in the action in question;
> (2) there was a final judgment on the merits; and
> (3) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication;

*In re Houston*, 2008 WL 5971043 (Bankr. D. Mont. 2008).

The issue of whether Warburtons and Earl were partners is identical with the issue presented in Warburton's DOLI wage claim proceedings, which they appealed to the state district court. Ex. 39 shows the parties to the DOLI proceedings were the same or in privity with the

42

parties in this adversary proceeding, as Plaintiff is Earl's Estate. It is undisputed that Warburtons'
appeals were dismissed, the latest on December 22, 2011, and that decision is final. Therefore,
the Court applies issue preclusion and finds and concludes that the parties were partners in
ABRG. Under § 523(a)(4) and *McCormick v. Brevig*, 2007 MT 195, ¶ 68, Warburtons are
fiduciaries. Additionally, Warburtons are trustees for the partnership for any property, profit or
benefit derived by them from ABRG. *See* MCA § 35-10-405(2)(a)(ii).

The second element of § 523(a)(4), defalcation has previously been defined by this Court
as the "misappropriation of trust funds or money held in any fiduciary capacity; [the] failure to
account for such funds." *In re Blixseth*, 459 B.R. 444, 460 (Bankr. D. Mont. 2011), quoting *Scott*,
97 F.3d at 1186. Plaintiff contends that Warburtons took partnership property in the form of cash
receipts and inventory and appropriated it for their own use. Debtors deny that they committed
defalcation. They argue that Earl had control of all accounts and they could not write checks,
draw money or use Earl's credit card, and they question how they could embezzle money from
themselves if they were partners. However, in the context of this proceeding, the Court is
analyzing Warburtons' actions under the element of "defalcation while acting in a fiduciary
capacity" and not under the element of "embezzlement," both of which are contained in §
524(a)(4).

The evidence does not support Debtors' contentions. The testimony of Earl, Groven and
Hanson establish that Linda did not make daily deposits of cash sale receipts. Earl, Goldstein and
Groven each testified that Linda made extensive charges on Earl's credit card for purchases of
inventory, even after Earl ordered those credit purchases stopped. Linda's credit charges left Earl
unable to use his own credit card to purchase a train ticket home after cancer treatment.

43

The evidence shows that Warburtons failed to account for the cash receipts or sales, and failed to account for the ABRG inventory they moved off-site and never returned. The Court finds and concludes that Warburtons committed defalcation under § 523(a)(4).

In *Bullock v. Bankchampaign, N.A.*, 2013 WL 1942393, __ U.S. __, __ S.Ct. __, the United States Supreme Court recently held that the scope of the term "defalcation" in § 523(a)(4) "includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase. We describe that state of mind as one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." 2013 WL 1942393 at * 2. The Court later explained in its opinion:

> Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985). *See id.*, § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include " 'wilful blindness' "). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.*, § 2.02(2)(c), at 226 (emphasis added).

2013 WL 1942393 at *5.

The evidence cited above, in this Court's view, easily establishes that the Warburtons consciously disregarded or was willfully blind to a substantial and unjustifiable risk that their conduct would violate a fiduciary duty. Their failure to deposit cash receipts, misappropriation of money and taking of ABRG inventory off-site and failure to return is "a gross deviation from the

44

standard of conduct that a law-abiding person would observe" in their situation. *Id.* Indeed, the evidence suggests further that Warburton's conduct was intentional. Earl went into business with Warburtons because he believed and trusted Linda when she told him she had 25 years of business experience, which he relied on to invest in ABRG. Instead of using her experience for all their benefit, Linda and John misappropriated the partnership's cash and inventory, and Earl's credit for their personal benefit. Now at the time of judgment, Warburtons flatly deny any responsibility for their conduct.[19]

Plaintiff contends that Debtors' defalcation of partnership property caused Earl to lose his entire investment,[20] which Plaintiff argues should be excepted from Debtors' discharge. Debtors contend that Plaintiff refused to answer their discovery requests[21] and gave no proof of the amount of Courtnage's investment, and that Debtors lost more than $80,000 worth of their own money and personal property after ABRG closed. They argue that Plaintiff has not proven that they have any inventory from ABRG after more than 2 years.

From Swanson's testimony the Court ascertains and finds that Earl's contributions to ABRG include $46,327.14 in inventory which he provided, plus another $20,000 in cash for a

---

[19]The Court recognizes that *Bullock* has changed the § 523(a)(4) landscape by abrogating the 9th Circuit precedent discussed in *In re Sherman*, 658 F.3d 1009, 1017 (9th Cir. 2011) and *Blyler v. Hemmeter (In re Hemmeter)*, 242 F.3d 1186, 1190 (9th Cir. 2001) ("[I]nnocent acts of failure to fully account for money received in trust will be held as nondischargeable defalcations; no intent to defraud is required."). Either bad faith or intentional acts grossly deviating from the standard of conduct that a law-abiding person would observe must occur.

[20]Plaintiff states the amount of the investment alternatively as $66,327, and later $69,461.43.

[21]Plaintiff's reply argues that Debtors never served discovery on Plaintiff within the time allowed under the Court's Scheduling Order, and never filed a motion to compel.

total investment of $66,327.14. Plaintiff's exhibits and testimony of Goldstein and Moore

establish and the Court finds that Plaintiff has recovered $19,000 in proceeds from the sale of

ABRG's assets, plus another $209 in value of the jewelry in the box. The difference between the

investment and Goldstein's recovery represents the Plaintiff's loss, which the Court finds is the

amount of $47,118.14 and represents Plaintiff's damages resulting from Warburtons' defalcation

while acting in a fiduciary capacity. The Court declines to award Plaintiff the $3,134.29 in

discovery sanctions awarded by the state court under § 523(a)(4), since that subsection does not

provide for attorney fees.

      Plaintiff's remaining First and Second Claims for Relief are based upon § 523(a)(2)(A)

and § 523(a)(6), which Plaintiff included in the approved pretrial order that Debtors did not sign.

Plaintiff's post-trial brief omits any discussion of § 523(a)(6), and other than a bare recitation of

the elements of § 523(a)(2)(A) on pages 32-33 of its brief Plaintiff does not discuss its First Claim

for Relief.

      This decision will result in denial of Debtors' discharges under § 727(a)(2) and §

727(a)(3), and exception of Plaintiff's claim in the amount of $47,118.14 from Debtors'

discharge. Given this result, so long as it stands, at this point the Court deems it unnecessary and

cumulative to proceed any further to decision on Plaintiff's First and Second Claims for Relief

under § 523(a)(2)(A) and § 523(a)(6).

## CONCLUSIONS OF LAW

      1. This Court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b) as

related to Debtors' bankruptcy case.

      2. Plaintiff's claims seeking exception from and denial of Debtors' discharge are core

proceedings under 28 U.S.C. §§ 157(b)(2)(I) and (J).

3. The Defendants/Debtors John E. Warburton and Linda R. Warburton are not credible; nor is their son Steve Warburton.

4. Plaintiff satisfied its burden of proof under 11 U.S.C. § 727(a)(2) and showed by a preponderance of the evidence that the Debtors transferred or concealed property with intent to hinder, delay or defraud creditors.

5. Plaintiff satisfied its burden of proof under 11 U.S.C. § 727(a)(3) and showed by a preponderance of the evidence that the Debtors removed, concealed, destroyed or failed to keep or preserve the partnership's books of account or financial records from which the partnership's business transactions may be ascertained, and that such failure made it impossible to ascertain the Debtors' financial condition and material business transactions. The burden of proof shifted to the Debtors, and they failed their burden to justify the inadequacy or nonexistence of records, and failed to show that they still are entitled to a discharge because the failure to keep or preserve records was justified under the circumstances of the case.

6. Under the doctrine of issue preclusion (collateral estoppel), the parties were partners under Montana law and for purposes of § 523(a)(4).

7. Plaintiff satisfied its burden of proof under § 523(a)(4) and showed by a preponderance of the evidence that its debt, in the net amount of $47,118.14, was caused by Debtors' defalcation while acting in a fiduciary capacity.

**IT IS ORDERED** a separate judgment shall be entered against the Defendants/Debtors Linda R. Warburton and John E. Warburton, in favor of the Plaintiff, excepting Plaintiff's debt in the amount of $47,118.14 from Debtors' discharge under 11 U.S.C. § 523(a)(4) for defalcation

while acting in a fiduciary capacity; and in addition denying Debtors' discharges under 11 U.S.C.

§ 727(a)(2) and § 727(a)(3).


BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana